IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2016

**STATE OF TENNESSEE v. JAMES LACKEY**

**Appeal from the Circuit Court for White County**
**No. 2012-CR-5631     David Alan Patterson, Judge**

**No. M2015-01508-CCA-R3-CD – Filed July 27, 2016**

Following a jury trial, the Defendant, James Lackey, was convicted of one count of second degree murder, see Tennessee Code Annotated section 39-13-210, for which he received a sentence of twenty-two years to be served at one-hundred percent. On appeal, the Defendant contends (1) that the evidence was insufficient to support his conviction, arguing that the proof supported a finding that he acted in self-defense, and (2) that the twenty-two year sentence imposed was excessive. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Manuel Benjamin Russ, Nashville, Tennessee (on appeal), and John Philip Parsons, Cookeville, Tennessee (at trial), for the appellant, James Lackey.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Gary McKenzie and Phillip Hatch, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On August 28, 2012, the Defendant was indicted for the first degree premeditated murder of the victim, James Caldwell. The case proceeded to trial in January 2014, where the following evidence was adduced. Around 1:30 a.m. on February 23, 2012,

Deputy Steven Daugherty of the Bedford County Sheriff's Office ("BCSO") received a phone call from the Defendant. According to Deputy Daugherty, the Defendant's "voice was pretty shaken[,] and [he] could tell something was wrong." The Defendant asked for Deputy Daugherty's help, saying that the deputy "was the only one he could trust." Deputy Daugherty explained that on that date, he had known the Defendant for approximately six months from their "shared hobby" of "work[ing] on Jeeps." The Defendant told Deputy Daugherty that he had shot someone and that he needed help contacting the Federal Bureau of Investigation ("FBI").

Deputy Daugherty contacted his supervisor and "instructed [the Defendant] to meet [him] at the [BCSO]." The deputy estimated that the Defendant arrived at the BCSO two hours later. When the Defendant arrived, Lieutenant Nikia Elliott of the BCSO went to the Defendant's truck, where he saw a gun in the front passenger seat; however, the gun was not removed at that time. Deputy Daugherty sat down with the Defendant and asked where the shooting had taken place. The Defendant was unable to provide a street address, but with the assistance of a global positioning system, the deputy was able to ascertain the location, which was in White County. Also, the Defendant confirmed that the victim was deceased.

Agent Larry Davis of the Tennessee Bureau of Investigation ("TBI") was dispatched to the BCSO to take the Defendant's statement. The Defendant's statement was recorded and played for the jury. In his statement, the Defendant told Agent Davis that he went to see the victim that night to talk to him. The Defendant explained that several weeks earlier, the Defendant had been at the victim's home in Warren County when the TBI conducted a drug raid. The Defendant's brother, Tommy Lackey,[1] lived with the victim, and the Defendant was at the home to assist Tommy with repairing a horse trailer. About twenty minutes after the Defendant arrived, TBI drug task force agents arrived and searched the house. The Defendant claimed that after TBI agents left the victim's home, there were drugs strewn throughout the house. In particular, the Defendant said there was methamphetamine and marijuana. The Defendant said that "didn't seem right to [him]" and "made [him] suspicious of what was going on." The Defendant also said that a gun had been confiscated from his truck during the raid, but it was returned to him within a week.

The Defendant told Agent Davis that he met with the victim several times after the drug raid to discuss what had happened. According to the Defendant, he was "trying to figure out . . . what was going on" and was concerned about Tommy. The Defendant explained that he was suspicious because no one had been arrested following the raid and

---

[1] Because the Defendant and his brother share a surname, we refer to Tommy by his given name to avoid confusion. We intend no disrespect in doing so.

because drugs were left in the house. The Defendant wanted to ensure that "the victim didn't get out of everybody's reach." The Defendant said that the victim was "trying to blame everything on [Tommy]." The Defendant told Agent Davis that he was keeping up with the victim for two reasons: (1) "there was something wrong with the [drug] bust" and (2) he "didn't trust [the victim]."

At some point after the raid, the Defendant was involved in a confrontation with the victim. The Defendant said that he was with Tommy when the victim showed up. The victim was angry, and the Defendant admitted pulling a gun on the victim. The victim told the Defendant that he did not have a gun and that the Defendant did not need to pull a gun on him. The Defendant told the victim that he did not trust him, that he knew that the victim had previously been convicted of murder, and that he was just trying to protect his brother. According to the Defendant, at the time of this confrontation he had heard that the victim believed that the Defendant was a "snitch" and that he was responsible for the TBI's raid at the victim's home. The encounter ended, and the Defendant said that he lost contact with the victim after that.

The Defendant said that after losing touch with the victim for about a week, Tommy called the Defendant on February 22 and said that the victim was ready to talk. Tommy told the Defendant where the victim was staying, and the Defendant drove from his mother's house in Manchester to the house where the victim was staying in White County, arriving around 12:00 a.m. The Defendant said that Tommy had been at the house earlier but was gone by the time he arrived. According to the Defendant, he "was real cautious" when he went to see the victim that night because he had been told that the victim and his family would "have snipers shoot him and all kinds of stuff." The Defendant told Agent Davis "it was just a matter of time before somebody was killed," and he knew he had "a target" on his back.

The Defendant said that the door to the house was open, and he let himself in, telling Agent Davis that the victim's "leg was bad," so he did not expect him to answer the door. After entering the house, the Defendant called out to let the victim know he had arrived, and the victim said he was in the back. The Defendant went to a bedroom in the back of the house, where he found the victim who was sitting on the bed. The Defendant claimed he was "pretty nervous" and said that "it was just like [the victim] had it planned out for [the Defendant] to come up there." The victim lit a cigarette, and then, according to the Defendant, the victim reached for a gun with his left hand from the "side of the bed." The Defendant said that his gun was in a holster on his hip, which he took out as soon as he thought he saw the victim reach for his gun. According to the Defendant, "before [the victim] ever got a chance to point at [him], [the Defendant] fired." The Defendant shot the victim in his chest, and the victim fell back on the bed. The Defendant claimed that the victim sat back up and pointed a gun at him, and the

-3-

Defendant fired a second shot, hitting the victim in his head. He estimated that he was eight to ten feet from the victim when he fired the shots.

The Defendant said that he checked the victim's pulse and then left the house immediately because the victim had "kinfolk" nearby, and the Defendant was worried that someone might have heard the gunshots and would come after him. He estimated that he was in the house for a total of five minutes. The Defendant said that he did not see where the victim's gun was and did not look for it after shooting him. After leaving, the Defendant called Tommy and instructed him to stay away from the house. The Defendant told Agent Davis that the victim was "known to keep a gun with him wherever he's at."

Sheriff Oddie Shoupe of the White County Sheriff's Office ("WCSO") was notified about the shooting and arrived at the scene at 4:15 a.m. Sheriff Shoupe parked at the bottom of the driveway and walked up to the house; he estimated the driveway was 350 feet long. The door to the house was open, and the sheriff entered the residence. Sheriff Shoupe found the victim in a bedroom. He observed that the victim was lying on his back on the bed and that he was deceased. Sheriff Shoupe said that it was still dark outside when he arrived. According to the sheriff, the lighting in the bedroom was "low," but he was able to "see the room and everything in it quite well." After securing the house, Sheriff Shoupe exited the residence and taped off the area.

WCSO Detective Chris Isom was assigned as the lead investigator on the case. Detective Isom testified that the bedroom where the victim's body was found was "well-lit," noting that a lamp and the television were on. The victim had two visible gunshot wounds—one to his chest and another under his right ear. Two shell casings were recovered from the room, one was located on a dresser, which was to the right of the bed, and the other was on the bed to the right of the victim's body. Detective Isom said that the placement of the casings was unusual because, based on the Defendant's account of what happened, he would have expected the casings to be in close proximity to one another. More specifically, Detective Isom said that one shell casing—the one recovered from the dresser—was consistent with the victim's being shot while he was sitting on the bed. However, the second casing—which was on the bed—was more consistent with the shooter "stepp[ing] closer" to the bed, "invert[ing]" the gun, and lowering it. According to Detective Isom, the victim's home was searched, but no guns were found. Also, Detective Isom said that the victim had a cell phone on his belt on his right side.

On cross-examination, Detective Isom admitted that it was possible that one of the casings could have hit and bounced off the wall, landing away from the other casing. Detective Isom opined that, based on the location of the victim's head wound, he did not believe the victim was sitting up at the time he was shot in the head. On re-direct

examination, Detective Isom said that he thought it was unlikely that one of the casings bounced off the wall.

Agent Dan Friel of the TBI assisted with the investigation. He identified a text message sent from the Defendant's cell phone to Tommy's cell phone at 3:27 a.m. on February 22, 2012.[2] The text message read, "tell big jim he can run but he cnt hide for lng i will be seeing yall in a few hes got yall fooled but not me hes a low life pos."[3] Agent Friel said that "pos" meant "piece of s--t."

Agent Friel took a statement from the Defendant on the evening of February 23 at the WCSO, accompanied by Detective Isom. Agent Friel said that the statement was not recorded and that his recollection of the interview was based on notes he had taken. In that statement, the Defendant told Agent Friel that he had been present at a drug raid that occurred at the victim's home on February 2. The Defendant said that the victim suspected that the Defendant was a snitch but that he and the victim met several times after the drug raid and before the shooting. The Defendant told Agent Friel that on the night of the shooting, he had been at his mother's house and that Tommy had called him and told him the victim wanted to meet to "talk stuff out." The Defendant was wearing a black shirt, black pants, and black boots and had a gun with him.

The Defendant went to the victim's house, saw that the door was open, and went inside. He "called for [the victim]," who stated he was in the back. The Defendant also said that he yelled "U.S. Marshalls" when he entered the house, explaining that he knew the victim was wanted by the U.S. Marshall so he thought it would be funny. The Defendant told Agent Friel that he walked to the bedroom where the victim was, that the victim lit a cigarette, and that he saw the victim reach for something with his left hand. The Defendant then pulled out his gun and shot the victim in the chest, but the victim sat back up and pointed a gun at him. The Defendant said he was not sure, but he might have stepped closer to the victim before shooting the victim in the head. The Defendant described the victim's gun as a black "sub-compact."

Agent Friel testified that the Defendant's statement was inconsistent with the evidence at the scene, explaining that the location of the shell casings did not match the Defendant's account. The Defendant told Agent Friel that he called Tommy after the murder. Agent Friel testified that the last call made from the Defendant's cell phone to Tommy occurred at 11:54 p.m. Agent Friel said that the Defendant did not call law

---

[2] The cell phone records had been previously authenticated and introduced by a records custodian for Verizon Wireless.

[3] We have reproduced the text message exactly as it appears in the cell phone records.

enforcement to report what occurred until he arrived back at his mother's house in Manchester. The Defendant told Agent Friel that he changed clothes before driving to the BCSO.

Agent Friel was aware that the Defendant had a firearm seized on February 2, 2012, which had subsequently been returned to him. He said that when the gun was seized, a record was made of the serial number and make and model.

Dr. Adele Lewis testified as an expert in forensic pathology. She performed the victim's autopsy. Dr. Lewis testified that the victim sustained two gunshot wounds. One wound was to the "middle part of his chest" and the other was to the right side of his head near his ear. According to Dr. Lewis, the bullet that entered the chest hit the aorta and left lung. She opined that this injury would have very likely been fatal. She further opined that it was very unlikely that someone with this type of injury would be able to sit up. She said that this bullet traveled from front to back and downward, which was consistent with the shooter standing over the victim. The bullet that entered the victim's head entered below the right ear and traveled through the brain stem and exited the left side of the head. According to Dr. Lewis, the trajectory of this bullet went from behind the ear and up through the victim's head. Dr. Lewis said that it was "very unlikely" and "not physically possible" for the bullet to have been fired downward. Rather, she opined that it was more likely that the victim was lying down when the bullet entered his head. Dr. Lewis testified that the gun was fired from an indeterminate range but was at least three feet away.

The Defendant testified that he met the victim through Tommy on the day of the February 2 drug raid. On that day, Tommy called the Defendant and asked him to work on a horse trailer located on the victim's property. According to the Defendant, Tommy and his wife had been living with the victim for three to four months. The Defendant described Tommy and the victim's relationship as being "like brothers." The Defendant said that just after he arrived, members of the TBI Drug Task Force raided the victim's house. According to the Defendant, the TBI found "a large amount of marijuana," a shotgun, a rifle, and two handguns. The Defendant said that the TBI also searched his truck and seized his handgun, for which the Defendant had a permit. The Defendant said his gun was later returned to him.

After the raid, the Defendant met with the victim several times. On one occasion, they met at a motel in Manchester where they discussed the drug raid. The victim told the Defendant that he was "concern[ed] for his [own] life" and "thought that his family was going to have him killed." Further, the victim told the Defendant that "he was not going back to prison." According to the Defendant, the victim thought the Defendant could help connect him with law enforcement to protect him because the Defendant had previously worked as an informant, and the victim was considering testifying against

-6-

members of his family who were involved in the drug trade. The Defendant said that the victim "went on the run from there," and he lost touch with the victim.

When asked why he was meeting with the victim, the Defendant said it was because of "what [he saw] during the drug bust." The Defendant elaborated, saying that he observed TBI agents move a suitcase from Tommy's bedroom to the victim's bedroom, where they took pictures of it, that no one was arrested, and that after the agents left, "there [were] drugs everywhere" in the house.

After the raid, the Defendant became aware that the victim thought he had been a "snitch" and was responsible for the TBI's raid at his house. The Defendant admitted that he had been involved in an altercation with the victim, during which he pulled a gun on the victim. The Defendant said that he was with Tommy one day when the victim showed up and "was mad at [Tommy]." The Defendant said that he pulled a gun on the victim because he thought the victim "would probably have a gun" and was "coming . . . to shoot [Tommy]."

On the night of the murder, Tommy called the Defendant, telling him that he knew where the victim was staying. According to the Defendant, the victim had "a bad leg" and "was taking prescription medication," which he had been unable to obtain while "on the run from law enforcement." The Defendant alleged that he went to the victim's that night to "see what the problem was," surmising that the victim "was suicidal probably and homicidal." The Defendant said that the victim was expecting him, and he parked at the bottom of the driveway and walked up to the house. He entered the house through the back door, which was open, and he "hollered" to let the victim know he was there. The victim responded that he was "in the back," and the Defendant walked to a bedroom in the back of the house. According to the Defendant, when he entered the room the victim pulled a gun from his left side. The Defendant said that the victim's gun "looked like a [.]380 or a sub-compact Glock." Upon seeing this, the Defendant drew his gun and fired at the victim; he waited "a couple seconds" and then fired again. The Defendant estimated that he was six feet away from the victim when he fired the first shot and that he took a step backward before firing the second shot. The Defendant checked the victim's pulse after the second shot and then left.

The Defendant said that he was afraid the victim had lured him to the house to kill him, but he went anyway because he thought the victim needed his help. According to the Defendant, he did not turn himself in to White County authorities because he "did not trust law enforcement in White County [or] [the victim's] family."

On cross-examination, the Defendant acknowledged that he had previously worked with the police as an informant, but he denied being paranoid about someone finding out. The Defendant said that he became worried after he found out that the

victim thought he was a "snitch." The Defendant admitted that as a result of his gun being seized on the day of the drug raid, police had a record of the make, model number, and serial number of his gun.

The Defendant agreed that after initially meeting with the victim following the drug raid, he lost touch with the victim. However, he denied looking for the victim. Nevertheless, he admitted that he called Tommy multiple times on February 22 and that Tommy told him where the victim was.

Upon this proof, the jury convicted the Defendant of the lesser-included offense of second degree murder, and the trial court sentenced the Defendant to twenty-two years to serve at one-hundred percent.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant first contends that the evidence is insufficient to support his conviction. The Defendant does not deny responsibility for the victim's death. Rather, he asserts that the State failed to disprove his claim that he acted in self-defense beyond a reasonable doubt. The State responds that there was adequate evidence that the Defendant did not act in self-defense and asks that we affirm the conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657, S.W.2d 405, 410 (Tenn.

1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The above standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . ." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The jury convicted the Defendant of the lesser included-offense of second degree murder. See Tenn. Code Ann. § 39-13-210. There is no question that the Defendant killed the victim; rather, the crux of the Defendant's sufficiency challenge is that the State failed to refute his claim that he acted in self-defense. Tennessee Code Annotated section 39-11-611(b)(2) provides as follows:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Self-defense is a factual question for the jury to resolve. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). However, it is within the prerogative of the jury to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

In the light most favorable to the State, the evidence showed that the victim suspected the Defendant had worked as an informant for the TBI and was responsible for a drug raid at the victim's house that took place three weeks prior to the murder. Although the Defendant and the victim met several times to discuss the raid, the Defendant eventually lost touch with the victim. The Defendant was concerned that the victim was going to evade law enforcement and that his brother, Tommy, would be held solely responsible for the drugs and guns recovered during the raid. Prior to the murder, the Defendant and the victim were involved in an altercation where the Defendant pulled a gun on the victim. Despite the Defendant's testimony that the victim was known to always carry a gun, the victim told the Defendant he was not carrying a weapon during that earlier altercation.

Less than twenty-four hours before the murder, the Defendant sent Tommy a text message, referring to the victim as a "pos," meaning "piece of s--t," and stating that he could run but that he could not hide for long. The Defendant admitted to calling Tommy several times in an attempt to locate the victim, and on the evening of February 22, 2012, Tommy told the Defendant where the victim was staying. Despite feeling like he had "a target" on his back, the Defendant traveled alone to see the victim at approximately 12:00 a.m., taking his gun with him. The Defendant gave conflicting stories as to why he went to see the victim that night: during his initial interview with Agent Davis, he alleged that he just wanted to talk to the victim, while at trial he testified that the victim had medical issues and the Defendant wanted to check on him. When he arrived at the house, rather than parking his car near the house, he parked at the bottom of the driveway and walked uphill approximately 350 feet.

Although the Defendant claimed that the victim had a gun, investigators found no guns in the house. Likewise, investigators testified that the Defendant's account of what transpired was inconsistent with the physical evidence at the scene. Specifically, the location of the shell casings suggested that after the Defendant shot the victim in the chest, he stepped closer to the victim and lowered the gun when firing the second shot into the victim's head. Likewise, the medical examiner opined that it was "not physically possible" that the bullet that entered the victim's head traveled in a downward trajectory. Rather, she testified that it was more likely that the victim was lying down when that shot was fired, and she questioned whether the victim would have been capable of sitting up

-10-

after the first gunshot given the catastrophic nature of the wound sustained to the chest. This testimony contradicted the Defendant's assertion that the victim sat back up after the first gunshot and pointed a gun at the Defendant.

In sum, the State provided sufficient evidence refuting the Defendant's claim that he acted in self-defense, and the jury's verdict shows that it also found the Defendant's account lacking. The Defendant's assertion that his version of events was "uncontroverted" is simply incorrect. We defer to the jury's ultimate decision to reject the claim of self-defense, for which there is ample support in the record. Accordingly, the Defendant is not entitled to relief.

## II. Sentencing

Next, the Defendant contends that his twenty-two-year sentence is excessive. He asserts that the trial court failed to engage in the requisite analysis when imposing his sentence, and he asks that we conduct a de novo review of his sentence. The Defendant further asserts that our supreme court's decision in State v. Bise, 380 S.W.3d 682 (Tenn. 2012), whereby the court held that the appropriate standard of review for sentencing decisions is an abuse of discretion with a presumption of reasonableness, is contrary to the plain language of Tennessee Code Annotated section 40-35-401(d) and is incorrect. Therefore, the Defendant asserts that even if we conclude that the trial court's analysis was sufficient, a de novo standard of review is appropriate. The State disagrees, asserting that the trial court's sentencing decision should be affirmed upon review under the abuse of discretion standard and responding that this court has no authority to overrule the supreme court's decision in Bise. On this second point, we agree with the State and decline the Defendant's invitation to revisit Bise as we have no authority to overrule our supreme court. We proceed to consider whether the Defendant's sentence is excessive based on currently applicable law.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that trial courts adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and

articulate in the record its reasons for imposing the specific sentence. See Bise, 380 S.W.3d at 705 n.41.

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." Bise, 380 S.W.3d at 708. Currently, upon a challenge to the length of the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

Our amended Sentencing Act no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

(d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 706. In accordance with the broad discretion now afforded a trial court's sentencing decision,

> misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

As a Range I offender convicted of a Class A felony, the Defendant's sentence range was fifteen to twenty-five years. See Tenn. Code Ann. 40-35-112(a)(1). When reaching its sentencing decision, the trial court noted it was "considering [Tennessee Code Annotated section] 40-35-210," specifically mentioning the six criteria in that statute. The court stated that when determining the length of the Defendant's sentence, it was bound to impose a sentence that was "no greater than that deserved for the offense and . . . the least severe necessary to achieve the purposes for which the sentence [was] imposed."

The court began by addressing the Defendant's social history, noting that he was thirty-nine years old and was married. The Defendant's sister testified at the sentencing hearing that the Defendant had five children and that they were "a close knit family," which the court took into consideration. Further, the Defendant had no criminal history, a relatively stable employment history, and only minor health conditions. The court applied mitigating factor (10) of section 40-35-113, stating that the Defendant provided the murder weapon to and cooperated with law enforcement officers and "shortened the length of time that it took for certain issues to be resolved in this case." The court recounted the circumstances of the offense, stating that it "place[d] a great deal of weight in its [sentencing] decision" on the details of the crime. The court applied enhancement factor (9)—that the Defendant possessed or employed a firearm during the commission of the crime.

The court concluded by stating that it "doesn't begin at the end of the range [but] . . . . applies enhancement and mitigating factors as an opportunity" to impose an appropriate sentence between fifteen and twenty-five years. It noted that based on "the enhancement factor and circumstances of the offense . . . in light of the mitigators [sic] and the social history of the [D]efendant," the State's recommendation of a twenty-two-year sentence was "very appropriate."

-13-

The Defendant contends that the trial court failed to articulate how it weighed the applicable mitigating and enhancement factors. He asserts that this failure requires that this court undertake a de novo review of the sentence imposed. However, we note that "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence. . . should not negate the presumption [of correctness afforded the trial court's sentencing decision]." Bise, 380 S.W.3d at 705-06. Accordingly, a sentence "should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. The record belies the Defendant's claim that the trial court's reasons for imposing a twenty-two-year sentence were inadequate. The trial court systematically went through the statutory requirements attendant to determining the length of the sentence. Therefore, we afford the trial court's decision a presumption of reasonableness and review only for an abuse of discretion. The court found that one enhancement factor and one mitigating factor applied and ultimately seemed more troubled by and placed considerable emphasis on the circumstances surrounding the offense. Although the Defendant contends that the trial court should have placed more emphasis on his cooperation with law enforcement and lack of previous criminal history, the court specifically weighed those factors when imposing the sentence. Accordingly, the Defendant has not carried his burden in showing that the trial court abused its discretion when it imposed a within-range, twenty-two-year sentence for second degree murder. Consequently, the Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE